THE CITY OF CHICAGO

*v.*

THE ILLINOIS STEEL COMPANY.

*Opinion filed October 23, 1907.*

1. MUNICIPAL CORPORATIONS—*principle of an equitable estoppel may be applied in matter of rights in street.* Municipal corporations are not within the statutes of limitation as respects public rights, but a court of equity may enforce an equitable estoppel against a city in the matter of asserting its right in a street where to permit such right to be asserted, after long acquiescence by the city in the expenditure of money in erecting buildings encroaching upon such street, would work gross injustice to private persons.

2. SAME—*when a city is equitably estopped to assert right in street.* A city will be held to be equitably estopped to assert its right in a street shown upon a plat, which, though executed with the statutory requirements, covered property not at that time within the city limits, where the city has for over forty years acquiesced in the exclusive occupation of the platted territory by the owners thereof and their predecessors in title, who erected costly buildings without regard to such street and in the belief that there was no street there, or that, if there ever had been one, it had been abandoned by the city.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

On October 13, 1853, Joseph E. Sheffield was the owner of the south-west quarter of section 32, township 40, north, range 14, east of the third principal meridian, and on that date he recorded in the recorder's office in Cook county a plat of a subdivision, which he called Sheffield's addition to Chicago. A better understanding of the location of the streets may be ascertained by referring to the following copy of this plat:

Blocks 17 and 18 were indicated, among others, on this plat. Block 17 was situated north of block 18, and between blocks 17 and 18 was a strip of land marked "Wabansia avenue," which extended in a north-easterly direction from a point west of Elston road to the westerly bank of the north branch of the Chicago river. Block 18 was divided into three lots, which were numbered. Lot 1 was north of lot 2 and lot 3 was west of the two other lots. Between lots 3 and 1 and 2, as shown on this plat, was a strip of ground marked "McHenry street," which extended in a southerly direction from Wabansia avenue to North avenue.

On October 22, 1856, the Chicago Land Company, which seems to have become the owner of blocks 17 and 18, made a subdivision of blocks 17, 18, 20 and others in Sheffield's addition to Chicago, a plat of which was recorded in the recorder's office of Cook county. On this plat McHenry street was shown as extending northerly from Wabansia avenue to the river, and there was also indicated a strip of land marked "Rawson street," running east from McHenry street to another strip indicated upon the plat, which ran northerly and southerly and which was denominated "Fleetwood street."

On January 28, 1876, Frederick Siebold, who had become the owner of lot 1 in block 18 in Sheffield's addition to Chicago, filed a plat in the recorder's office which was entitled "Koerner's subdivision of sub-lots 14, 32, 33, 34 and 35, also so much of sub-lot 13 as lies south of the north line of lot 14 extended to Rawson street." This property all lay in lot 1 of block 18 of Sheffield's addition. This plat also indicated Rawson street, which was shown as extending easterly to the western bank of the north branch of the Chicago river. There were also indicated on this plat three strips of land extending in a northerly direction from Rawson street, two of which were denominated "alley" and one "Fleetwood street."

On December 1, 1876, the North Chicago Rolling Mill Company, having become the owner of all that part of block 17 which lay on the east side of McHenry street and all of lot 1 of block 18 except such part of said block as was embraced in Koerner's subdivision, filed in the recorder's office of Cook county a deed purporting to vacate such part of lot 17 and such part of lot 1 in block 18 as it owned. On December 4, 1876, the North Chicago Rolling Mill Company filed in the recorder's office what is known as the "North Chicago Rolling Mill Company's re-subdivision of parts of blocks 17 and 18 in Sheffield's addition to Chicago."

229—20

A correct understanding of the changes made may be ascertained by an examination of the following plat:

In that plat Wabansia avenue is shown extending from McHenry street to the north branch of the Chicago river. That portion lying north of Wabansia avenue and between McHenry street and the river was denominated lot A of block 17, and that portion lying south of Wabansia avenue

and between McHenry street and the river was denominated sub-lot B of lot 1 of block 18. This re-subdivision made no change in Koerner's subdivision. Subsequent to this time appellee became the owner of the property lying on both sides of McHenry street from its intersection with Redfield street to the south bank of the north branch of the Chicago river, and also of lot A in block 17 and sub-lot B of lot 1 of block 18, according to the North Chicago Rolling Mill Company's re-subdivision, which was all the property situated on both sides of Wabansia avenue as it extended from McHenry street to the west bank of the north branch of the Chicago river. It also became the owner of all the lots in Koerner's subdivision, being the property on both sides of the alleys and of Fleetwood street, as shown in Koerner's subdivision, and also on both sides of Rawson street as it extended from McHenry street to Fleetwood street.

On September 17, 1898, appellee filed a deed of vacation in the recorder's office of Cook county, which purported to vacate so much of each and every of the aforementioned plats as lay within its property. This vacation was intended to include that portion of McHenry street which extended from Redfield street to the Chicago river; that portion of Wabansia avenue extending from McHenry street to the Chicago river; that portion of Rawson street which extended from McHenry street to the Chicago river, and that portion of Fleetwood street which extended in a northerly direction from Rawson street and the two alleys, as shown in Koerner's subdivision. On November 30, 1900, appellee filed in the recorder's office a plat of its property, which was entitled "Illinois Steel Company's north works addition to Chicago, being a part of section 32 of township 40, north, range 14, east of the third principal meridian," upon which all of its property was indicated as block 1.

A small shed stood east of McHenry street, about the center of Wabansia avenue, on the strip which extends from McHenry street to the river, and on July 8, 1903, appellant,

through its agents, entered upon the land and commenced to tear the shed down. On July 13, 1903, appellee filed a bill of complaint in the superior court of Cook county, praying that appellant, its agents, officers and servants, might be perpetually enjoined from removing materials, buildings and structures from the strips of land in controversy here, or from in any way obstructing, interfering with or harassing appellee in its use of said lands. Appellant filed its answer, and the cause was referred to John J. Healy, master in chancery. On November 14, 1904, the court entered an order transferring the case from master Healy to master George W. Miller, and on January 9, 1906, it was ordered transferred from master Miller to John F. Holland, master in chancery, who on May 18, 1906, filed his report, with a conclusion that the essential allegations of the bill of complaint had not been proven and that appellee was not entitled to the relief prayed for in regard to Wabansia avenue, McHenry street and that part of Rawson street west of Fleetwood street; that it was entitled to the relief prayed for as to that part of Rawson street east of the west line of what was formerly Fleetwood street, and he recommended a decree accordingly. Exceptions were filed to the master's report, and on July 24, 1906, a decree was entered sustaining the exceptions to the master's report and finding that the essential allegations of the bill were proven, and that appellee was entitled to the relief prayed for except as to that strip of land marked "Rawson street" extending from McHenry street to Fleetwood street. It was ordered, adjudged and decreed that appellant, its agents, officers and servants, be perpetually enjoined from removing any material, buildings or structures situated on the several strips of land marked "McHenry street" extending from Redfield street northerly to the Chicago river, and marked "Wabansia avenue" extending from McHenry street easterly to the Chicago river, and also several strips marked "streets" and "alleys" on the plat known as Koerner's subdivision. Ap-

pellant was further perpetually enjoined from in any way interfering with material, buildings and structures upon these strips of land or from in any way obstructing, interfering with or harassing appellee in its use of these strips of land. Appellant thereupon perfected an appeal and brings the record to this court for review.

JAMES HAMILTON LEWIS, (A. L. GETTYS, and D. R. LEVY, of counsel,) for appellant.

KNAPP, HAYNIE & CAMPBELL, for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

The city of Chicago claims to be the owner in fee of the *locus in quo* by virtue of a dedication of the land for streets by the plats set out in the foregoing statement. It is admitted that the plats in question were properly executed under the statute and constituted a valid offer to dedicate the premises designated as streets on said plats. Sheffield's plat was made in 1853 and the Chicago Land Company's subdivision in 1856. There is no proof in the record of a formal acceptance of the offer to dedicate under either of these plats. Whether there was an implied acceptance by the city is a question upon which both parties have offered much testimony and have argued that issue elaborately in their briefs. The validity and effect of the vacation deed of appellee on September 17, 1898, is also a question which is the subject of extended argument by both parties in this court. In the view that we take of this case it will not be necessary to consider any of the foregoing questions.

In 1857 these additions were not inside the corporate limits of the city of Chicago. The territory was open, unimproved prairie, and there were no houses or other improvements in that vicinity. Up to this time the execution and filing of the two plats of 1853 and 1856 was all that had been done looking toward building up the addition. In

1857 O. W. Porter, representing E. D. Ward of Detroit, commenced the construction of a rolling mill on the west side of the Chicago river on the property designated as lot A of block 17 or sub-lot B of lot 1 of block 18. The exact location of this building is not clearly pointed out by the evidence. For the convenience of the mill owners in getting material to construct the mill a dock was constructed at the end of Wabansia avenue. The building material was brought to the dock on scows. When the mill was completed it became necessary to construct dwelling houses for the mill employees. The houses, and also a boarding house for the convenience of the mill employees, were erected along the extension of Wabansia avenue between McHenry street and the mill, and a sidewalk was built in front of these houses. These buildings were constructed by the mill company for its own benefit, and neither the city nor the public appears to have had anything to do with them. Later, when the lots occupied by the houses were required for extensions of the mill property, they were torn down and moved away by the company and the plant was extended west to McHenry street. After the extension of the plant to McHenry street the mill premises were enclosed by a fence, and a sign was erected at the west end of tract B warning all persons other than employees to keep out, and the mill company kept a watchman stationed there to enforce this warning. The evidence shows that the mill company and its successors have had exclusive, open and uninterrupted possession of all of the premises lying east of McHenry street to the Chicago river and north of the south line of lot 1 in block 18 to the river. After the removal of the cottages and extension of the plant to McHenry street the strips of land representing the extension of Wabansia avenue east to the river and the extension of McHenry street north to the river, designated B and A, respectively, have been occupied and used by the company under a claim of right in the same manner and to the same extent that it

used other portions of its mill site. Railroad tracks have been laid wherever the convenience of the mill company required them, regardless of whether they were in or out of the supposed streets. There appear to be some eighteen or twenty railroad tracks and spurs that traverse some portion of Wabansia avenue east of McHenry street. The south end of the north rail mill extends practically to the center of Wabansia avenue, and the south mill, another extensive building of the mill company, is immediately south of the north rail mill but not upon any portion of the street. The evidence shows that the blast furnaces, the rail mill, the Bessemer steel mill and other parts of the plant were located in close proximity to each other, some upon one side and some upon the other of the alleged street, and that the location of the different mills is such that if Wabansia avenue were opened up and used as a public highway the plant would be rendered inoperative. The space in Wabansia avenue between the rail mill and the south mill is occupied by railroad tracks, weighing offices, rail-loading docks, turn-table, and other things pertaining to the finishing and delivery end of the rail mill. The rail mill and the south mill were both operated from the same steam supply. The conditions are such that it would be utterly impossible to operate the plant without re-constructing it if Wabansia avenue should be opened up as a street to the river. We have no means of knowing the amount invested in these various buildings and appurtenances in connection with this plant, or how much it would cost to re-construct the same if the street in question were opened up. It is stated by counsel for appellee that the plant represents an investment of millions of dollars. It is apparent that appellee's plant represents a very large amount of money, and it is not pretended by appellant that the opening up of the proposed street will not entail upon appellee a very heavy loss. During all of these years, from about 1859 to the beginning of this suit, the municipality of Chicago has stood by and by its silence acquiesced in the oc-

cupation by the appellee and its predecessors of the street in question, knowing that appellee was investing large sums of money on the faith and belief that there was no street there, or that if there ever had been one it had been abandoned by the city. Under these facts appellant is equitably estopped from insisting that appellee's buildings and other structures constitute an obstruction to the highway.

The case of *Reichert Milling Co.* v. *Village of Freeburg,* 217 Ill. 384, is a case very much like the case at bar and announces the principle that must control here. The same principle has been applied in many other cases in this court. (*Village of Winnetka* v. *Prouty,* 107 Ill. 218; *Village of Auburn* v. *Goodwin,* 128 id. 57; *Village of Vermont* v. *Miller,* 161 id. 210; *Jordan* v. *City of Chenoa,* 166 id. 530; *City of Carlinville* v. *Castle,* 177 id. 105; *People* v. *City of Rock Island,* 215 id. 488.) In the case last above cited this court, on page 495, said: "It has frequently been decided that the doctrine of estoppel *in pais* is applicable to municipal corporations, but that they will be estopped or not, as justice and right may require. There may be cases where, under all the circumstances, to assert a public right would be to encourage and promote a fraud. Where a party acting in good faith under affirmative acts of a city has made such extensive and permanent improvements that it would be highly inequitable and unjust to destroy the rights acquired, the doctrine of equitable estoppel will be applied. The hardships that would result from a contrary holding, and the necessity of raising an estoppel in particular cases to prevent fraud and injustice, have induced the establishment of the rule, and it has been several times said that there is neither danger to the public nor injustice in the application of the doctrine. In the exercise of proper diligence the public authorities may prevent encroachments upon public right, and if they do not, any citizen may take the necessary steps to do so, and if there is not only a failure to act by either, but affirmative action by the public authorities with

the apparent approval of every one interested, under which the situation is changed and permanent improvements are made, the principles of equity require that the public should be estopped."

Municipal corporations are not within statutes of limitation except as to private right, but courts of equity will prevent the operation of this rule by enforcing an equitable estoppel where to permit the assertion of a right in a street after long acquiescence in the expenditure of money in the erection of buildings there would work a gross injustice to the rights of private persons. The facts bring this case within this rule, and there was no error in granting a perpetual injunction by the court below.

The decree is affirmed.

*Decree affirmed.*